


**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

JUN 1 7 2026

CLERK, U.S. DISTRICT COURT
TEXAS EASTERN

| | |
|---|---|
| UNITED STATES OF AMERICA | § |
| | § |
| v. | § |
| | § |
| ████████████████, | § |
| ████████████, | § |
| ████████████ ██ | § |
| ████████ | § |
| **GUISEPPE RAFAILA (02)** | § |
| *aka "Alex Ionita"* | § |
| *aka "Rafaila Giuseppe"* | § |
| ████████████ ██ | § |
| ██████████ ██ | § Case No. 6:26-CR- 78 |
| █ ███████████ | § JUDGES JDK -JDL |
| ███████████ | § |
| ████████████, | § |
| ████████████ | § |
| ████████████████ | § |
| **CARLOS ANTONESCU (08)** | § |
| *aka "Hassan Imran"* | § |
| *aka "Carlos Daniel Mozdrogan"* | § |
| *aka "Carlos Daniel Padina"* | § |
| *aka "Rinaldo"* | § |
| █████████████ | § |
| ██████████ | § |
| **NATALIE MUNOZ SANCHEZ (10)** | § SEALED |

## **INDICTMENT**

THE UNITED STATES GRAND JURY CHARGES:

### **General Allegation**

At times material to this Indictment:

Indictment – Page 1

1.      The term "ACCESS DEVICE" means any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, or other means of account access that can be used alone or in conjunction with another access device to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument).

2.      A CREDIT CARD OR DEBIT CARD is an "access device" that contains identification information and authorizes the person named on the credit card to make charges for which he or she will be billed periodically by the card issuer. A debit card looks, acts, and contains the same information as a credit card, but withdraws the money immediately from the card holder's affiliated bank account. But credit and debit cards utilize wire communication in the verification and authorization process of a transaction. Each credit or debit card account has a unique number issued to it. A credit or debit card account number is also an "access device." Credit card issuers, such as companies like VISA, American Express, MasterCard, and Discover, and some federally insured banks and credit unions, place means of identification and personal information on each card by physically stamping or embossing information such as the account number, the account holder's name, and the expiration date for the account. Credit card issuers and financial institutions also program the magnetic strip on the back of the card with the account holder's account number, name, and the expiration date for the account. The term "counterfeit access device" means any access device, including a credit card, debit card, credit card number, or debit card number that is counterfeit, fictitious,

Indictment – Page 2

altered, or forged, or an identifiable component of an access device or a counterfeit access device.

3.      The term "UNAUTHORIZED ACCESS DEVICE" means any access device, including a credit card, debit card, credit card number, or debit card number that is lost, stolen, expired, revoked, canceled, or obtained with the intent to defraud.

4.      The term "MEANS OF IDENTIFICATION" includes any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any access device. A credit card or debit card account number is a means of identification.

5.      The term "DEVICE-MAKING EQUIPMENT" means any equipment, mechanism, or impression designed or primarily used for making an access device or a counterfeit access device.

6.      "CARD SKIMMING" is a scheme that utilizes an electronic device (SKIMMER) through which a credit card can be swiped or inserted, as if making a credit card transaction. From the cards magnetic strip, the skimming device reads information such as a credit or debit card account number and other customer information stores that information on the device. Utilizing an encoder and a computer, the skimming device allows a person to steal credit or debit card information and place that information onto another card, allowing fraudulent transactions to be made with the new card. In many cases, suspects also install a pinhole camera or similar recording device positioned near the ATM keypad. These cameras are often concealed within small overlays or other objects attached to the ATM. The purpose of the camera is to record the victim entering

Indictment – Page 3

their Personal Identification Number (PIN). By capturing both the card data and the associated PIN, suspects are able to fully compromise the victim's bank account. Once suspects obtain card data and associated PIN numbers from numerous victims, they typically use the stolen information to create counterfeit debit or credit cards. Perpetrators often return to ATMs like the locations where the data was originally stolen and conduct large numbers of fraudulent withdrawals, commonly referred to as "cash-outs," in order to remove funds from the victims' accounts. A skimmer is a device-making equipment as defined in 18 U.S.C. 1029(e)(6). Although the basic ideal is the same, skimmers come in a variety of forms, with different insertions and concealment features.

7. An ATM DEEP INSERT SKIMMER is a specially designed electronic device that is inserted deep inside the card reader slot of an ATM (Automated Teller Machine). Because the device is placed within the internal card reader assembly, it is typically undetectable to customers conducting legitimate transactions at the ATM terminal. The device captures and stores card data from the magnetic stripe of cards inserted into the machine.

8. An OVERLAY SKIMMER is a device designed to resemble an ATM's legitimate card reader. The device is placed over the existing ATM card reader, allowing the suspect to intercept the magnetic stripe data when victims insert their cards. Because the overlay closely mimics the appearance of the original reader, victims are generally unaware that their card data is being captured.

9. A POINT-OF-SALE (POS) SKIMMER is a device constructed to mimic a legitimate point-of-sale card reader used inside retail stores. These devices are placed

Indictment – Page 4

over or attached to an existing payment terminal to capture payment card information during legitimate transactions. POS skimmers are specifically designed for the sole purpose of intercepting and storing payment card data from unsuspecting victims.

10.  EBT FRAUD: In cases involving Point-of-Sale skimmers, suspects frequently target EBT (Electronic Benefit Transfer) cards. After collecting card data through POS skimmers, suspects review the stolen information, which is typically stored in Track Data format within text files. Suspects then analyze the data to identify state-specific EBT Bank Identification Numbers (BINs). A BIN, also known as an Issuer Identification Number (IIN), consists of the first 6 to 8 digits of a payment card and identifies the financial institution that issued the card.

a.  Once suspects identify valid EBT card data, they commonly use the stolen cards to purchase large quantities of goods at grocery stores or retail locations. These goods are then sold through third-party individuals, commonly referred to as "fences," in order to convert the stolen benefits into cash. In other cases, suspects may sell the stolen EBT card information directly to individuals or businesses.

b.  Some businesses knowingly process stolen EBT cards through their payment terminals as if the transactions were legitimate purchases. This allows the business to receive funds from the EBT transaction system without providing goods to the cardholder, thereby unlawfully profiting from the fraudulent transaction.

11.  ZELLE is a digital payment service operated by Early Warning Services,

LLC, a company co-owned by several large American banks, including Bank of America, JP Morgan Chase and Wells Fargo. Zelle operates as a peer-to-peer service, allowing for direct financial transfers between bank account within the United States.

## COUNT ONE

Violation:  18 U.S.C. § 1956(h)
(Conspiracy to Commit Money
Laundering)

12.     The General Allegation of this indictment is realleged and incorporated by reference as though fully set forth herein.

13.     Beginning in or about September 2022, the exact date being unknown to the United States Grand Jury, and continuing thereafter until at least the date of the return of this indictment, the exact dates being unknown to the Grand Jury, in the Eastern District of Texas, and elsewhere,



**GUISEPPE RAFAILA** (02)
*aka "Alex Ionita"*
*aka "Rafaila Guiseppe"*

**CARLOS ANTONESCU** (08)
*aka "Hassan Imran"*
*aka "Carlos Daniel Mozdrogan"*
*aka "Carlos Daniel Padina"*
*aka "Rinaldo"*

███████████████████████

**NATALIE MUNOZ SANCHEZ** (10)

did, along with others known and unknown to the Grand Jury, knowingly combine, conspire, and agree to commit offenses against the United States in violation of 18 U.S.C. §§ 1956 and 1957, that is:

FINANCIAL TRANSACTIONS in violation of 18 U.S.C. § 1956(a)(1)(B)(i):

to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, **bank fraud** (18 U.S. Code § 1344), **wire fraud** (18 U.S.C. § 1343), **aggravated identity theft** (18 U.S.C. § 1028A), and **access device fraud** (18 U.S.C. § 1029) knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct

Indictment – Page 7

such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity;

**INTERNATIONAL PLACEMENT**
in violation of
18 U.S.C. § 1956(a)(2)(B)(i):

to knowingly transport, transmit, and transfer, and attempt to transport, transmit, and transfer funds from a place in the United States to a place outside the United States, knowing that the funds involved in the financial transactions represented the proceeds of some form of unlawful activity and knowing that such transportation was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, that is, **bank fraud** (18 U.S. Code § 1344), **wire fraud** (18 U.S.C. § 1343), **aggravated identity theft** (18 U.S.C. § 1028A), and **access device fraud** (18 U.S.C. § 1029); and

**MONETARY TRANSACTIONS**
in violation of
18 U.S.C. § 1957

to knowingly engage and attempt to engage, in monetary transactions by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a

Indictment – Page 8

value greater than $10,000, and such property having been derived from a specified unlawful activity, that is **bank fraud** (18 U.S. Code § 1344), **wire fraud** (18 U.S.C. § 1343), **aggravated identity theft** (18 U.S.C. § 1028A), and **access device fraud** (18 U.S.C. § 1029).

## Object and Purpose of the Conspiracy

14. The objective of the conspiracy was for defendants and their co-conspirators to conceal and disguise the nature, location, source, ownership, and control of the millions of dollars in proceeds that they had unlawfully and unjustly obtained by defrauding victims – including persons, financial institutions, and the United States Government – through the operation of a nationwide card skimming operations. The ultimate goal was to unlawfully enrich themselves and their families.

## Manner and Means of the Conspiracy

15. The manner and means by which the defendants and their co-conspirators sought to accomplish the objectives and purpose of the conspiracy was to obtain funds through a nationwide card skimming operation, then subsequently utilize financial transactions to avoid the detection of the unlawful funds. Generally, the full scheme follows this playbook:

16. SKIMMER DEPLOYMENT AND COLLECTION: Suspects travel to targeted locations, often outside of their home area, in an effort to avoid detection. These locations are selected based on the type of ATM or payment terminal and whether it is compatible

Indictment – Page 9

with the skimming devices being used. Suspects will commonly secure temporary lodging, such as hotels or short-term rentals, to operate within the area. Once in place, suspects typically install skimming devices during low-traffic times, including early morning hours, late at night, or on days when banks are closed. The devices are left on the machines for a short period of time, usually up to 72 hours due to battery limitations, before being retrieved. After removal, suspects will often replace the device with another and continue this process over several days or weeks in the same area to collect as much compromised card data as possible.

17.     DATA EXTRACTION AND CARD COMPROMISE: Once retrieved, the skimmers are downloaded to receive the stored stolen card data, in track data format. This data is reviewed and organized for use in fraudulent transactions. The compromised data is then encoded onto blank magnetic stripe cards, gift cards, or other cards to create functional counterfeit cards. In cases involving ATM skimming, the suspects will directly access the victim bank accounts.

18.     FRAUDULENT WITHDRAWALS AND TRANSACTIONS: Suspects use the cloned cards to conduct unauthorized withdrawals from victim accounts, often returning to the same or similar ATM locations to avoid triggering fraud detection systems. Transactions are typically structured to minimize detection, including multiple smaller withdrawals rather than single large transactions.

19.     POINT-OF-SALE SKIMMING OPERATIONS: Suspects specifically target retail locations with compatible terminals and, in some cases, focus on businesses serving lower-income populations to obtain electronic benefit transfer (EBT) card data. Stolen

Indictment – Page 10

EBT data is used to conduct fraudulent purchases of goods, which are later resold for cash through third parties, or the data itself is sold to others at a percentage of the card's available balance. In this case it has been seen skimming suspects take 42% of the available card balance.

20. PLACEMENT INTO THE FINANCIAL SYSTEM: The proceeds generated from fraudulent withdrawals and transactions are distributed among participants and further laundered through a variety of methods. Suspects commonly avoid depositing large sums into a single account, instead structuring deposits in smaller increments across multiple accounts. Funds are then transferred between co-conspirators using peer-to-peer payment platforms, including Zelle, or other electronic transfer methods. In some instances, businesses knowingly facilitate fraudulent transactions by processing stolen card data as legitimate purchases, allowing funds to be disbursed through commercial channels.

21. INTERNATIONAL TRANSFERS: A portion of the proceeds is transferred outside the United States, including to individuals located in Romania, indicating an international component to the laundering operation. A portion of the proceeds is also used to purchase additional skimming devices, skimmer components, and related equipment to facilitate the ongoing scheme. These items are commonly sourced from overseas suppliers, including China, with payments frequently made through services such as Western Union.

**Indictment – Page 11**

## Acts in Furtherance of the Conspiracy

22.     In furtherance of the conspiracy and to achieve its objectives and purpose, the following acts, among others, were committed in the Eastern District of Texas and elsewhere.

### *Skimming incidents:*

23.     The conspiracy conducted numerous skimming events across the United States. These events further the objective of the conspiracy by obtaining funds, transporting the funds to co-conspirators and subsequently placing cash funds and electronic funds into the financial system. These events include but are not limited to following:

| On or about | Location | Defendants | Incident |
| --- | --- | --- | --- |
| May 25, 2023 | Tyler, Texas<br>Eastern District of Texas | Unindicted Coconspirators | ATM skimming at Cooperative Teachers Credit Union |
| December 27, 2023 | Tyler, Texas<br>Eastern District of Texas | Unindicted Co-conspirator | ATM skimming |
| January 16-17, 2024 | Roanoke, Texas<br>Eastern District of Texas | Unindicted Co-conspirators (including one juvenile) | ATM skimming |
| July 27,2023 | Harwood, Texas<br>Western District of Texas | ████████ and Unindicted Coconspirator | Possession of access device making equipment |
| April 19, 2024 | Port Neches, Texas<br>Eastern District of Texas | ████████ | Cash-out |
| April 20, 2024 | Beaumont, Texas<br>Eastern District of Texas | Unindicted Co-conspirators | ATM skimming |
| June 9, 2025 | Lindsay, Texas<br>Eastern District of Texas | Juvenile Co-conspirator | ATM skimming |

Indictment – Page 12

| June 29, 2025 | Grapevine, Texas Northern District of Texas | Juvenile Co-conspirator | Cash-out |
|---|---|---|---|
| September 24, 2025 | Grapevine, Texas Northern District of Texas | Unindicted Co-conspirators | POS skimming |
| September 11, 2023 | Houston, Texas Southern District of Texas | Unindicted Co-conspirators | POS skimming at Walmart |
| April 20, 2024 | Baytown, Texas Southern District of Texas | Unindicted Co-conspirators | ATM Skimming |
| April 5-12, 2024 | Houston, Texas Southern District of Texas | Unindicted Co-conspirators | ATM Skimming |
| November 26, 2023 | New Braunfels, Texas Western District of Texas | Unindicted Co-conspirators | ATM Skimming |
| July 28-29, 2023 | Sugar Land, Texas Southern District of Texas | Unindicted Co-conspirators | ATM Skimming at First Community Credit Union |
| August 4, 2023 | Pearland, Texas Southern District of Texas | **Guiseppe Rafaila** and Unindicted Co-conspirators | ATM Skimming at Texas Bay Credit Union |
| February 27, 2024 | West Chester Township, Ohio | **Giueseppe Rafaila,** ██████████ ██████████ | ATM Skimming |
| March 14, 2024 | Austin, Texas Western District of Texas | Unindicted Co-conspirators and **Natalie Munez Sanchez** | POS Skimming |
| September 24, 2025 | Garland, Texas Norther District of Texas | Unindicted Co-conspirator and **Carlos Antonescu** | POS Skimming |

24. In furtherance of the conspiracy the defendants and co-conspirators conducted thousands of Zelle transactions amongst themselves, involving the proceeds of the conspiracy's nationwide skimming operations. These financial transactions were done the in an effort to conceal and disguise the nature, location, source, ownership, and control of the criminal proceeds, and ultimately funnel the funds out of the United States. The financial transactions include, but are not limited to following:

*Financial transactions during the indictment timespan:*

| Defendant | Financial transaction(s) | Amount | To and From |
|---|---|---|---|
| ████████████ | Zelle | $304,688.27 | 13 known co-conspirators |
| ████████████ | Zelle | $292,418.58 | 8 known co-conspirators and 8 businesses connected to the conspiracy |
| ████████████ | Zelle | $226,091.86 | 12 known co-conspirators and 7 businesses connected to the conspiracy |
| ████████████ | Zelle | $142,158.00 | 6 known co-conspirators |
| ████████████ | Zelle | $96,744.65 | 6 known co-conspirators |
| ████████████ | Zelle | $57,565.79 | 5 known co-conspirators |
| **Natalie Munoz Sanchez** | Zelle | $11,458.00 | 4 known co-conspirators |
| ████████████ | Zelle | $7,322.00 | 5 known co-conspirators |

25.     During the time span of this indictment, the defendants and unindicted co-conspirators conducted numerous financial transactions via Zelle. Thousands of small scale transactions were conducted on Zelle account specifically linked to Bank of America accounts, and the total amount transacted through these transactions totaled over 2 million dollars.

In violation of 18 U.S.C. § 1956(h).

## COUNT TWO

> Violation: 18 U.S.C. § 1349
> (Conspiracy to commit Wire Fraud)

26.     The General Allegation of this indictment is realleged and incorporated by reference as though fully set forth herein.

27.     Beginning in or before 2023, and continuing through at least June 2026, in the Eastern District of Texas and elsewhere,



**GUISEPPE RAFAILA** (02)
*aka "Alex Ionita"*
*aka "Rafaila Guiseppe"*

**CARLOS ANTONESCU** (08)
*aka "Hassan Imran"*
*aka "Carlos Daniel Mozdrogan"*
*aka "Carlos Daniel Padina"*
*aka "Rinaldo"*

**NATALIE MUNOZ SANCHEZ** (10)

along with others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate, and agree to violate 18 U.S.C. § 1343, wire fraud; that is, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce any writings, signs, signals, pictures, and sounds for the purpose of executing a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises.

28. The **Object and Purpose of the Conspiracy**, the **Manner and Means of the Conspiracy** and the **Acts in Furtherance of the Conspiracy** are described above in Count 1 and are realleged as though fully set forth herein.

In violation of 18 U.S.C. § 1349.

## <u>COUNT THREE</u>

<u>Violation</u>: 18 U.S.C. § 1029
(Conspiracy to commit Access
Device Fraud)

29. The General Allegation of this indictment is realleged and incorporated by reference as though fully set forth herein.

30. Beginning in or before 2023, and continuing through at least June 2026, in the Eastern District of Texas and elsewhere,



**GUISEPPE RAFAILA** (02)
*aka "Alex Ionita"*
*aka "Rafaila Guiseppe"*

Indictment – Page 16



**CARLOS ANTONESCU** (08)
*aka "Hassan Imran"*
*aka "Carlos Daniel Mozdrogan"*
*aka "Carlos Daniel Padina"*
*aka "Rinaldo"*

**NATALIE MUNOZ SANCHEZ** (10)

along with others known and unknown to the Grand Jury, did knowingly

and willfully combine, conspire, confederate, and agree to violate 18 U.S.C. §

1029, namely:

| | |
|---|---|
| PRODUCING, USING, OR TRAFFICKING IN A COUNTERFEIT ACCESS DEVICE In violation of 18 U.S.C. § 1029(a)(1) and (c)(1)(a)(i) | Knowingly and with intent to defraud, produced, used, or trafficked in counterfeit access devices as defined and production or trafficking counterfeit access devices, said production, trafficking, or use affecting interstate and foreign commerce, and |
| ILLEGAL POSSESSION, PRODUCTION, OR TRAFFICKING IN DEVICE-MAKING EQUIPMENT In violation of 18 U.S.C. § 1029(a)(4) and (c)(1)(a)(ii). | Knowingly and with intent to defraud, produced, trafficked in, or possessed device-making equipment, said production, trafficking, and |

Indictment – Page 17

possession affecting interstate and foreign

commerce.

31.     The **Object and Purpose of the Conspiracy**, the **Manner and Means of the Conspiracy** and the **Acts in Furtherance of the Conspiracy** are described above in Count 1 and are realleged as though fully set forth herein.

In violation of 18 U.S.C. § 1029.

Indictment – Page 18

## NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE
### Pursuant to 18 U.S.C. § 981 (a)(1)(C), 18 U.S.C. § 982(a)(1), and 18 U.S.C. § 982(a)(2)(B)

As the result of committing one or more of the foregoing offenses alleged in this indictment, the defendants herein shall forfeit to the United States, pursuant to 18 U.S.C. § 981 (a)(1)(C), 18 U.S.C. § 982(a)(1), and 18 U.S.C. § 982(a)(2)(B).

1.  any property constituting, or derived from, and proceeds the defendants obtained, directly or indirectly, as the result of such violations;

2.  any of the defendants' property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violations, and/or;

3.  any and all firearms, ammunition and accessories seized from the defendants.

**Substitute Assets**

If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

(a)  cannot be located upon the exercise of due diligence;
(b)  has been transferred or sold to, or deposited with a third person;
(c)  has been placed beyond the jurisdiction of the court;
(d)  has been substantially diminished in value; or
(e)  has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property, including but not limited to all property, both real and personal owned by the defendant.

By virtue of the commission of the offense alleged in this indictment, any and all interest the defendant has in the above-described property is vested in the United States

Indictment – Page 19

and hereby forfeited to the United States pursuant to 18 U.S.C. § 981 (a)(1)(C), 18 U.S.C. § 982(a)(1), and 18 U.S.C. § 982(a)(2)(B).

All pursuant to 18 U.S.C. § 982(a)(1) and the procedures set forth at 21 U.S.C. § 853, as made applicable through 18 U.S.C. § 982(b)(1).

A TRUE BILL

_____
GRAND JURY FOREPERSON

JAY R. COMBS
UNITED STATES ATTORNEY

_____
EMIL MELCHIOR MIKKELSEN
ASSISTANT UNITED STATES ATTORNEY

6/17/26
_____
Date

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

UNITED STATES OF AMERICA

v.



GUISEPPE RAFAILA (02)
    *aka "Alex Ionita"*
    *aka "Rafaila Giuseppe"*

Case No. 6:26-CR-____
JUDGES _____

CARLOS ANTONESCU (08)
    *aka "Hassan Imran"*
    *aka "Carlos Daniel Mozdrogan"*
    *aka "Carlos Daniel Padina"*
    *aka "Rinaldo"*

NATALIE MUNOZ SANCHEZ (10)

**NOTICE OF PENALTY**

**COUNT ONE**

VIOLATION:           18 U.S.C. § 1956(h)
                          Conspiracy to Commit Money Laundering

Indictment – Page 21

PENALTY:                     Imprisonment of not more than twenty (20) years; the
                             greater of a fine not to exceed $500,000 or twice the
                             value of the monetary instrument or funds involved in
                             the transportation, transmission, or transfer, whichever
                             is greater, or both such imprisonment and fine; and a
                             term of supervised release of not more than three (3)
                             years.

SPECIAL ASSESSMENT:          $100.00


## COUNT TWO

VIOLATION:                   18 U.S.C. § 1349
                             Conspiracy to Commit Wire Fraud

PENALTY:                     Imprisonment of not more than twenty (20) years; the
                             greater of a fine not to exceed $250,000 or two times the
                             gross gain to the Defendant, or two times the loss to the
                             victim, or both such imprisonment and fine; and a term
                             of supervised release of not more than three (3) years.


SPECIAL ASSESSMENT:          $100.00

## COUNT THREE

VIOLATION:                   18 U.S.C. § 1029(b)(2)
                             Conspiracy to Commit Access Device Fraud

PENALTY:                     *If Possession and Use of Access Device*: Imprisonment
                             of not more than five (5) years; a fine not to exceed
                             $250,000; and a term of supervised release of not more
                             than three (3) years.

                             *If Possession and Use of Device-making Equipment*:
                             Imprisonment of not more than 7 years and 6 months
                             years; a fine not to exceed $250,000; and a term of

Indictment – Page 22

Case 6:26-cr-00078-JDL *SEALED* Document 1 Filed 07/23/26 *SEALED* Page 23 of 23 PageID #: 23

supervised release of not more than three (3) years

SPECIAL ASSESSMENT:    $100